## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| CHARLES M. SHAIN and SANDRA KRONE on behalf of themselves and all other Persons and entities Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ABBOTT LABORATORIES, FOURNIER INDUSTRIE ET SANTE, and LABORATORIES FOURNIER, SA<br><br>Defendants. | NO.<br><br><br>CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL |

Plaintiffs, Charles M. Shain and Sandra Krone, on behalf of themselves and all other persons and entities similarly situated, by and through their undersigned attorneys, bring this civil action against Defendants Abbott Laboratories ("Abbott") and Fournier Industrie et Sante and Laboratories Fournier, SA ("Fournier" and collectively with Abbott "Defendants"), for injunctive relief and damages as a result of Defendants' violation of the federal antitrust laws and the deceptive practices statutes of 23 states and the District of Columbia and allege, upon information and belief, as follows:

### NATURE OF THE ACTION

1.  This action is brought under the federal antitrust statutes and/or the deceptive practices statutes of twenty-three (23) states and the District of Columbia to remedy Defendants' anti-competitive activities.

2.  TriCor® is a widely prescribed drug and is approved by the United States Food and Drug Administration ("FDA") to control high levels of cholesterol.

3.     A capsule version of the brand named drug TriCor® was first marketed by Defendants in 1998. Defendants' total sales of the TriCor® product have generated more than $750 million in revenues.

4.     This case arises out of Defendants' efforts to unlawfully create and maintain a patent monopoly in the U.S. market for cholesterol lowering drugs that contain the active pharmaceutical ingredient ("API") fenofibrate. Defendants have marketed fenofibrate products under the brand name TriCor®. In order to extend their patent for TriCor®, Defendants created a scheme whereby, if a generic drug manufacturer sought to market a generic version of TriCor®, the Defendants would then modify its drug formulation in a medically insignificant way which would then have to be approved by the FDA. After receiving approval from the FDA to market this "new" TriCor® formulation as a "new drug," the generic manufacturer, seeking to market the generic version would then be required to obtain FDA approval. The scheme would involve Defendants aggressively having physicians switch individuals who were taking this medication to a drug product containing this "new" formulation which would in turn destroy the market for the "old" formulation. Finally, Defendants filed sham patent litigation against the generic manufacturers. These patent actions would then trigger the automatic thirty-month stay required by the Hatch-Waxman amendments which then delayed generic entry to the market of the "old" formulation. During the delay Defendants converted people to the "new" formulation. By the time the 30 month stay expired the market for the "old" formulation was destroyed. Generic companies would then be forced to apply to the FDA to market this "new" formulation. Defendants would then repeat the scheme by modifying the drug formulation in a medically insignificant way which would then have to again be approved by the FDA.

5.     Defendants' actions have unlawfully restrained competition by illegally hindering

2

competition by launching and promoting "new" formulations while affirmatively destroying the market for the "old" formulations, and filing sham patent litigation. By affirmatively destroying the market for the "old" formulations Defendants have prevented patients and doctors from choosing the cheaper generic products made from the "old" formulations.

6.     Defendants' unlawful, anti-competitive conduct has resulted in the price of TriCor® being fixed at artificially high and supra-competitive levels. Additionally, plaintiffs and the other members of the Class were deprived of the opportunity to purchase generic fenofibrate based prescription drugs. But for Defendants' unlawful activity, class members would have paid less money for fenofibrate based prescription drugs.

7.     Plaintiffs bring this claim on behalf of all end-payers, *i.e.* consumers and third-party payers, the last persons and entities in the chain of distribution, who purchased TriCor® other than for resale from April 9, 2002 to the present (the "Class Period").

8.     Plaintiffs seek a judgment declaring Defendants' conduct unlawful under § 2 of the Sherman Act, 15 U.S.C. § 2, and pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26, enjoining continuation of Defendants' monopolistic practices.

9.     Neither plaintiffs nor the Class seek any relief under § 4 of the Clayton Act, 15 U.S.C. § 15.

10.     Plaintiffs and the Class seek damages and equitable relief for Defendants' violations of the antitrust and/or deceptive practice statutes of Arizona, California, District of Columbia, Florida, Iowa, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin (collectively the "24 Jurisdiction End-User Purchasers").

3

11.    Plaintiffs and the Class seek equitable remedies as to Defendants' unjust enrichment.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § § 1331, 1337 and 1367 and § 16 of the Clayton Act, 15 U.S.C. § 26.

13.    Pursuant to the provisions of 15 U.S.C. § 22 and 28 U.S.C. § 1391, venue is properly laid in this judicial district because, Defendants transact business, maintain offices or are found within this judicial district. Furthermore, the interstate commerce described below was, and is carried on, in part, within this judicial district.

14.    This court also has jurisdiction pursuant to 28 U.S.C. § 1332 (d)(2) which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which "any member of a class of plaintiffs is a citizen of a state different from any Defendant."

## PARTIES

15.    Plaintiff, Charles M. Shain, is a resident of New York, NY.  Plaintiff purchased TriCor® manufactured by Defendants, during the proposed Class Period.

16.    Plaintiff, Sandra Krone, is a resident of Lafayette Hill, PA.  Plaintiff purchased TriCor® manufactured by Defendants, during the proposed Class Period.

17.    Defendant, Abbott Laboratories, is corporation with a principal place of business at 100 Abbott Road, Abbott Park, Illinois. Defendant manufactures and distributes pharmaceuticals including TriCor®.  Abbott is the licensee from Defendant Fournier of the five

4

patents listed in the Orange Book for TriCor® products.

18.     Defendants Fournier Industrie et Sante formerly known as Fournier Innovation et Synergic and Laboratories Fournier, SA, are French corporations with a principal place of business at 42 Rue de Longvie, 21300 Chenove, France. Defendants manufacture and distribute pharmaceuticals including TriCor®.

19.     The acts charged in this Complaint as having been done by the Defendants were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management of the Defendants' business or affairs.

## INTERSTATE COMMERCE

20.     Defendants manufacture, distribute and sell TriCor® in a continuous and uninterrupted indirect flow to the end-user plaintiffs and the Class they represent. TriCor® is manufactured and sold by Defendants throughout the United States where it is used as a prescription medication used to lower cholesterol.

21.     During the entire Class Period, Defendants sold and shipped substantial quantities of TriCor® in a continuous and uninterrupted flow in interstate commerce to customers located in states other than the states in which Defendants manufactured TriCor®.

22.     In addition, throughout the Class Period, in connection with the purchase and sale of TriCor®, monies, as well as contracts, bills and other forms of business communication and transactions, were transmitted in a continuous and uninterrupted flow across state lines.

23.     The business activities of Defendants that are the subject of this Complaint were within the flow of, and substantially affected, interstate trade and commerce.

## CLASS ACTION ALLEGATIONS

24.     Plaintiffs bring this action as a class action, pursuant to Federal Rule of Civil

5

Procedure 23(a) on behalf of the following class:

> All persons and entities who purchased, within the United States,
> TriCor®, in any form, manufactured by Defendants, at any time
> during the period from April 9, 2002 to the present (the "Class").

Excluded from the Class are Defendants, their subsidiaries and affiliates, and government
entities. For purposes of this class definition, persons and entities "purchased" TriCor® if they
paid some or all of the purchase price.

25.   Plaintiffs do not, as yet, know the exact size of the Class. However, based upon
the nature of the trade and commerce involved, plaintiffs believe that the total number of Class
members is in the thousands, if not hundreds of thousands, and that Class members are
geographically dispersed throughout the United States. For that reason, joinder of all members
of the Class is not practicable.

26.   There are questions of law and/or fact common to the Class which predominate
over any questions affecting only individual members of the Class. Such common questions
include, without limitation, the following:

> a.   the definition of the relevant market for analyzing Defendants'
>      monopoly power;
>
> b.   whether Defendants had monopoly power in the relevant market;
>
> c.   whether Defendants illegally obtained such monopoly power;
>
> d.   whether Defendants illegally maintained monopoly power in the relevant
>      market;
>
> e.   whether competition has been restrained as a result of the alleged
>      misconduct;
>
> f.   whether Defendants engaged in the filing of sham patent litigation;

6

g.    whether the unlawful conduct of Defendants caused a delay of the manufacture and marketing of generic fenofibrate-based prescription drugs from April 9, 2002 to the present;

h.    whether plaintiffs are entitled to declaratory and injunctive relief; and

i.    whether plaintiffs and the Class members paid more for TriCor® than they would have had to pay in a competitive market place, unfettered by Defendants' unlawful, fraudulent, unfair and anti-competitive conduct.

27.    Plaintiffs' claims are typical of the claims of the Class members. Plaintiffs will fairly and adequately protect the interests of the Class. The interests of the named plaintiffs are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiffs have retained counsel who are experienced in the prosecution of antitrust and unfair competition class actions, and plaintiffs will vigorously prosecute this case on behalf of the Class.

28.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. A class action would allow plaintiffs and the Class members to pursue claims that would be uneconomical to pursue individually. The Class is readily definable and is one for which records should exist. Prosecution as a class action will eliminate the possibility of repetitious litigation or inconsistent judgments.

## RELEVANT MARKET

29.    To the extent applicable to the claims alleged herein, the relevant product market is the market for the manufacture and sale of fenofibrate based prescription drugs, including TriCor® and generic versions of TriCor®.

30.    The relevant geographic market is the United States for Counts I and III and the Indirect Purchaser States for Count II.

7

31.     At all times material hereto, Defendants' market share in the relevant product and geographic markets was and is between 95% to 100%.

## BACKGROUND

### A.     The Federal Regulatory Scheme for Generic Drugs

32.     In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act 1984, Pub. L. No. 98-417, 98 Stat. 1585 (the "Hatch-Waxman Amendments"), amending the Federal Food, Drug, and Cosmetics Act, 21 U.S.C. §§ 301-392.  Under the Food, Drug, and Cosmetic Act, drug manufacturers must obtain FDA approval for any new drug by filing a New Drug Application ("NDA"), which requires the submission of specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.

33.     The FDA lists patents which apply to the new drug - the "pioneer drug" - in its publication known as the Approved Drug Products With Therapeutic Equivalence Evaluations, typically referred to as the "Orange Book."  To be properly listed in the Orange Book, the patent must meet two statutory requirements.  First, the patent must "claim the drug" or "a method of using such drug."  Second, the patent must be such that "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug."  21 U.S.C. §§ 355(b) and 355(c)(2).

34.     The Hatch-Waxman Amendments provide that companies may seek approval to produce and market a generic form of a previously approved, or "pioneer" drug by filing only an ANDA that relies on the safety and effectiveness findings reported in the NDA for the previously approved drug.  One of Congress' central goals in enacting the Hatch-Waxman Act and the ANDA provision was "to bring generic drugs onto the market as rapidly as possible."  Nova

8

Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1068 (D.C. Cir. 1998).

35.    The ANDA must include information concerning the generic drug company's

position with respect to the patent for the previously approved drug, and must include one of four

certifications:

> I.    that no patent for the pioneer drug has been filed with the FDA (a
> "Paragraph I Certification");
>
> II.    that any patent listed in the FDA Orange Book for the
> pioneer drug has expired (a "Paragraph III Certification");
>
> III.    at the patent for the pioneer drug will expire on a particular
> date and the generic drug company does not seek to market
> its generic product before that date (a "Paragraph
> Certification"); or
>
> IV.    that the patent for the pioneer drug is invalid or will not be
> infringed upon by the generic drug company's proposed
> product (a "Paragraph IV Certification").

36.    If the ANDA does not address all of the patents listed for a drug in the Orange

Book by means of one of the above four certifications, the FDA will not approve the generic

drug for sale.

37.    Generic drugs are invariably priced below the branded drugs to which they are

bioequivalent. The first generic competitor to enter a market typically does so at a price at least

30% lower than the price of the equivalent brand-name drug and quickly takes a substantial

amount of market share away from the brand-name manufacturer. As additional generic

competitors come to market, the price of the generic equivalents continues to fall, and their

combined market share continues to grow. In some cases, generic competitors sell products

equivalent to brand-name prescription drugs for as little as 15% of the price of the brand-name

drug, and have captured as much as 90% of the brand-name drug's pre-generic sales. Unless the branded manufacturer lowers prices to meet competition, a branded drug loses a significant portion of its market share to generic competitors less than a year after the introduction of generic competition.

38.    If a generic version of a brand-name drug exists and the physician has not specifically indicated on the prescription "DAW" or "dispense as written" (or similar indications, the wording of which varies slightly from state to state), then: (a) for consumers covered by most insurance plans, the pharmacist will substitute the generic drug; and (b) for consumers whose purchases are not covered by insurance plans, the pharmacist will offer the consumers whose purchases are not covered by insurance plans, the pharmacist will offer the consumer the choice of purchasing either the branded drug, or the AB-rated generic at a lower price.

39.    Once a physician writes a prescription for a brand-name such at TriCor®, that prescription defines and limits the market to the drug named or its AB-rated generic equivalent. Only drugs which carry the FDA's AB generic rating may be substituted by a pharmacist for a physician's prescription for a brand-name drug.

40.    The price competition engendered by generic drug manufacturers benefits all purchasers of the drug, who are able to buy the same chemical substance at much lower prices. Many health insurance companies and employee benefit plans encourage or require substitution of generic drugs for brand-name drugs in order to lower health care costs. Retail pharmacies routinely substitute generic drugs for brand-name drugs whenever possible in order to lower their own costs and the costs of their customers.

**B.    Defendants' Brand-Name Version of Fenofibrate Based Prescription Drugs : TriCor®**

4T.     Pharmaceutical products with the fenofibrate based substance reduce high levels of low density lipoprotein cholesterol ("LDL-C"), sometimes referred to as "bad cholesterol," and triglycerides by promoting the dissolution and elimination of fat particles in the blood. Fenofibrate products also increase levels of high-density lipoprotein cholesterol ("HDL-C"), sometimes referred to as "good cholesterol," or mixed dyslipidemia (high bad cholesterol and high triglycerides).

42.     Abbott received final approval for NDA No. 019304 for 67 mg fenofibrate capsules on February 9, 1998. Abbott subsequently received final approval for 134 mg and 200 mg fenofibrate capsules on June 30, 1999. Abbott submitted to the FDA for listing in the Orange Book Patent No. 4,984,726 (the"'726 patent"), which was granted on January 23, 1990 to Fournier and exclusively licensed to Abbott in 1997.

43.     Novopharm Ltd. filed an ANDA for 67 mg fenofibrate capsules (the "Capsule ANDA") on December 14, 1999 and sought approval to market its fenofibrate capsule product prior to the expiration of the '726 patent. Novopharm certified that its product did not infringe the '726 patent, and duly and timely notified Abbott of its ANDA. The ANDA was amended on March 31, 2000 and November 27, 2000 to include the 200 mg and 134 mg strength capsules.

44.     On April 7, 2000, Abbott and Fournier sued Novopharm in the United States District Court for the Northern District of Illinois for infringement of the '726 patent based on Teva's Capsule ANDA for 67 mg and 200 mg fenofibrate capsules. With the filing of the lawsuit the automatic 30-month stay under the Hatch-Waxman Act was triggered. The FDA was prevented from granting final approval to Teva's Capsule ANDA. In April 2000, Novopharm was acquired by Teva. Abbott and Fournier then sued Impax in the Northern District of Illinois, giving rise to a 30-month stay, as to Impax.

11

1.    **Defendants' First Market Switch**

45.    Abbott held NDA No. 021203 for 54 mg and 160 mg fenofibrate tablets, which the FDA approved on September 4, 2001 and through its licensing agreement, with Fournier, sold 54 mg and 160 mg fenofibrate tablets in the United States under the brand name TriCor®. Ninety-Five percent (95%) of all sales of fenofibrate products, and One Hundred percent (100%) of all fenofibrate tablet sales, in the United States have accounted for Abbott sales.

46.    Following approval from the FDA of Abbott's NDA for fenofibrate tablets, Defendants then took affirmative steps to destroy the market for generic fenofibrate capsules by removing the fenofibrate capsule code from the National Drug Data File® ("NDDF"), and removing (or "obsoleting") TriCor® brand fenofibrate capsules from the market. NDDF is a widely accepted database provided by First Databank, Inc. that includes drug descriptive and pricing information with an extensive array of clinical decision-support modules. This information is used by the healthcare industry as a database. By removing TriCor® capsules from the NDDF, the branded drug code reference no longer exists for purposes of generic substitution laws or for purposes of health care providers' pharmaceutical benefit programs.

47.    By removing the capsules from the market, Defendants' also changed their sales force and stopped detailing the capsule formulation in the market. By removing the capsule code from the NDDF, Abbott and Fourier rendered the TriCor® capsule code, to which Teva's capsules would have been compared, obsolete.

2.    **Summary Judgment for Teva For a Product**
**That Could No Longer Be Marketed as a Generic**

48.    The Court in the Northern District of Illinois granted Teva's motion for summary judgment of noninfringement of the '726 patent on March 19, 2002. The judgment permitted

12

Teva to market its fenofibrate capsule product. The Illinois court granted Impax's motion for summary judgment on March 26, 2003.

49.    Subsequent to the grant of summary judgment, Teva received final FDA approval to market its 200 mg (as well as 134 mg) fenofibrate capsule products, and tentative FDA approval to market its 67 mg fenofibrate capsule products on April 9, 2002. Teva began to sell its 200 mg and 134 mg fenofibrate capsule products in April 2002. As the first filer of a capsule ANDA with a Paragraph IV certification, Teva was granted a six-month exclusivity period during which the FDA would not grant final approval to another fenofibrate capsule ANDA. This exclusivity period could reasonably provide to Teva the expectation of making more than $100 million in sales at prices substantially less than the price for branded TriCor® capsules.

50.    Due to Defendants' anticompetitive tactics, the favorable decision and the exclusivity period proved to be no victory to Teva. By removing TriCor® capsules from NDDF, Defendants created a situation where there was no longer a brand reference drug for Teva's fenofibrate capsules. Defendant's only purpose in removing the capsule code from the NDDF was to halt generic competition from Teva and other generic manufacturers in the fenofibrate product market. If the capsule code had been maintained in the NDDF, there would still have been a reference for which Teva's generic capsules could have been substituted. However, with no branded TriCor® capsule code as a reference, and without the continuation of Abbott's capsules in the marketplace, there was no longer a market for generic fenofibrate capsule products. Thus, most of the fenofibrate capsules that Teva had shipped to its customers were returned and Teva was effectively blocked from the market as a generic competitor in the fenofibrate market.

51.    The statutory 30-month stay on the FDA's approval of Teva's Capsule ANDA for

13

67 mg fenofibrate capsules ended on October 7, 2002 thereby allowing Teva to enter the then-defunct capsule market with that dosage. Subsequently, on October 23, 2003, Impax was granted final approval to market its fenofibrate capsule products.

### 3. Teva Files an ANDA

52.    Teva next sought to market generic fenofibrate tablets. Teva filed with the FDA an ANDA for its generic fenofibrate 54 mg and 160 mg tablets (the "Tablet ANDA") on June 17 2002. In connection with its Tablet ANDA, Teva submitted a Paragraph IV certification that the ANDA did not infringe the '726 Patent, as well as two additional patents, U.S. Patent No. 6,074,670 (the "670 Patent") and U.S. Patent No. 6,277,405 (the "405 Patent). On August 21, 2002, Teva gave notice to Abbott and Fournier of the filing of the Tablet ANDA and the Paragraph IV certification made therein.

53.    Defendants then filed patent infringement action at Civil Action No. 02-1512, which asserted that Teva's Tablet ANDA infringed the '726 Patent, the '670 Patent, and the '405 Patent, which triggered an automatic 30-month stay under the Hatch-Waxman Act. This action prevented the FDA from granting final approval to Teva's Tablet ANDA for so long as the statutory stay remained in effect.

54.    Defendants listed U.S. Patent No. 6,589,552 (the "552 Patent") in the Orange Book for TriCor® 54 mg and 160 mg tablets, on July 23, 2003.

55.    Teva supplemented its Tablet ANDA by filing a Paragraph IV certification to the '552 Patent on July 29, 2003. On that date, Teva gave notice to Abbott and Fournier of the filing of its Paragraph IV certification to the '552 Patent.

56.    On August 29, 2003, in response to Teva's Paragraph IV certification to the '552 Patent, Defendants filed patent infringement action at  Civil Action No. 03-847 on August 29,

14

2003. This patent infringement action against Teva triggered *another* 30-month automatic stay period under the Hatch-Waxman Act. This successive 30-month stay commenced and, absent a court decision, will continue in effect more than one year after the first 30-month stay that went into effect with the filing of the first action, C.A. No. 02-1512.

### 4. Abbott Submits NDA

57.    Abbott next submitted NDA No. 021656 to the FDA for its new version of TriCor® fenofibrate tablets in 48 mg and 145 mg dosage forms on October 29, 2003. Abbott and Fournier did not seek FDA approval for this new formulation product until after they knew that Teva had developed generic fenofibrate tablets and was seeking approval to sell those tablets in the United States.

58.    Abbott and Fournier listed U.S. Patent No. 6,652,881 (the"881 Patent") in the Orange Book for TriCor® 54mg and 160mg tablets on December 12, 2003.

59.    On December 17, 2003, Teva supplemented its Tablet ANDA by filing a Paragraph IV certification to the '881 Patent and gave notice to Abbott and Fournier of the filing of its Paragraph IV certification to the '881 Patent.

60.    Defendants then filed patent infringement action Civil Action No. 04-0047 on January 22, 2004 claiming that Teva's Tablet ANDA infringed the '881 Patent. Due to the amendments to the Hatch-Waxman Act in December, 2003, another 30-month stay was not available to Defendants.

### 5. Teva's Tentative Approval for 54 mg and 160 mg Fenofibrate Tablets

61.    The FDA granted tentative approval to Teva's Tablet ANDA on March 5, 2004 indicating that Teva's fenofibrate 54 mg and 160 mg tablets are bioequivalent to TriCor® tablets of the same dosage strengths. Due to the successive 30-month stays resulting automatically from

15

Abbott's and Fournier's filing and maintenance of their patent infringement actions against Teva concerning Teva's Tablet ANDA, the FDA was legally precluded from granting final approval to Teva's Tablet ANDA until the stays expire or a court enters judgment in Teva's favor.

### 6. Defendants' Second Market Switch

62.     Abbott announced that it had received FDA approval to market the 48 mg and 145 mg TriCor® fenofibrate tablets on November 5, 2004.  The 48 mg and 145 mg TriCor® products are indicated for the exact same uses as the 54 mg and 160 mg tablet dosage forms.

63.     Defendants have already begun marketing their new TriCor® tablet products, and they have stopped supplying the market with the 54 mg and 160 mg TriCor® tablets.  The supply of Abbott's and Fournier's 54 mg and 160 mg TriCor® tablets soon disappeared and Abbott and Fournier removed the brand reference code from the NDDF.

64.     Teva then announced on May 16, 2005 that the FDA granted final approval for the Company's Tablet ANDA for fenofibrate tablets, 54mg and 160mg.

65.     Upon final approval of Teva's Tablet ANDA, the purpose of Abbott's and Fournier's patent infringement litigation had served its purpose.  Thus, on the same day that Teva announced final approval of its ANDA, May 16, 2005, Abbott and Fournier informed the judge presiding over the patent infringement actions that "they no longer wish to prosecute their consolidated patent infringement action against Teva and Impax."

### ANTI-COMPETITIVE EFFECTS

66.     Defendants' unlawful exclusionary conduct has prevented competition in the market for fenofibrate based prescription drugs.  By removing TriCor® capsules from the NDDF, the branded drug code reference no longer exists for purposes of generic substitution laws or for purposes of health care providers' pharmaceutical benefit programs.  As a result of Defendants'

16

conduct, competitors have been prevented competitors from selling generic versions of TriCor®

which would have been available in April, 2002.

67.    The prices for TriCor® have been fixed, raised, maintained or stabilized at

artificially high and noncompetitive levels.

68.    Buyers of TriCor® have been deprived of the benefits of free and open

competition in their purchases.

69.    Competition in the production and sale of TriCor® and its generic equivalents has

been restrained, suppressed and eliminated.

70.    Plaintiffs and the other Class members paid more for the TriCor® that they

purchased than they would have had to pay under conditions of free and unrestricted

competition.

71.    As a direct and proximate result of Defendants' wrongful conduct, Defendants

have wrongfully profited and obtained substantial monies from plaintiffs and the members of the

Class.

## COUNT I

### FOR DECLARATORY AND INJUNCTIVE RELIEF
### UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS
### OF SECTION 2 OF THE SHERMAN ACT

72.    Plaintiffs  incorporate by reference Paragraphs 1 through 71 as though fully set

forth herein.

73.    This Count is brought by plaintiffs on behalf of the Class.

74.    Section 2 of the Sherman Act states that it is illegal to monopolize, or attempt to

monopolize any part of interstate trade or commerce.

75.    From at least April 9, 2002, Defendants possessed 100% monopoly power in the

17

market for the manufacture and sale of fenofibrate based prescription drugs including TriCor®
and its generic versions, in the United States. But for Defendants' unlawful anti-competitive
conduct, as alleged herein, Defendants would have never obtained monopoly power in the
relevant market.

76.    Defendants knowingly and willfully acquired and maintained its monopoly power
through unlawful conduct including the filing of sham patent litigation in attempting to
unlawfully extend its patent for its fenofibrate product.

77.    Defendants filed sham patent litigation for the anti-competitive purpose of
delaying the introduction of generic versions of TriCor® into the market.

78.    Defendants' repetitive filing of sham patent litigation were and are part of a policy
to prevent manufacturers of generic drugs from marketing a generic form of TriCor®.

79.    In sum, Defendants' bad faith conduct was done with the intent and purpose, and
had the effect, of obtaining and maintaining monopoly power and restraining competition in the
relevant market.

80.    While obtaining and possessing unlawful monopoly power in the market for
TriCor®, Defendants fixed, maintained, and raised the price of TriCor® to artificially high
and/or supra-competitive levels.

81.    Plaintiffs and the other members of the Class were injured in their business or
property-by reason of Defendants' antitrust violation alleged in this cause of action. Their injury
consists of paying higher prices for fenofibrate based prescription drugs than they would have
paid in the absence of that violation. Their injury is of the type the antitrust laws were designed
to prevent and flows from that which makes Defendants' conduct unlawful.

82.    Pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. §

2201(a), plaintiffs and the Class are entitled to a declaration that Defendants' monopolization and

attempts to monopolize the market for TriCor® and its generic equivalents violated §2 of the

Sherman Act.

83.    Plaintiffs and the Class are entitled to an injunction pursuant to §16 of the Clayton

Act enjoining Defendants' continued monopolistic practices.

84.    Plaintiffs and the Class have no adequate remedy at law.

**COUNT II**

**FOR DAMAGES UNDER THE ANTITRUST AND DECEPTIVE
PRACTICES STATUTES OF THE INDIRECT PURCHASER STATES**

85.    Plaintiffs repeat and incorporate herein by reference paragraphs 1 through 84 of

this Complaint as if fully set forth herein.

86.    This Count is brought by plaintiffs on behalf of the 24 Jurisdiction End-User

Purchasers.

87.    Defendants' intentional and wrongful acquisition and maintenance of its

monopoly power in the relevant market, as alleged herein, violates the following antitrust and/or

deceptive practice Indirect Purchaser statutes:

a.    Arizona Revised Stat. § § 44-1401, et seq. with respect to purchases of
TriCor® in Arizona by members of the 24 Jurisdiction End-User
Purchasers;

b.    the Cartwright Act, California Business and Professions Code Section
16700 et seq. and/or the California Unfair Competitions Act, California
Business and Professions code Sections 17200 et seq. with respect to
purchases of TriCor® in California by members of the 24 Jurisdiction
End-User Purchasers;

c.    D.C. Code Ann. §§ 28-4501 et seq., with respect to purchases of TriCor®
in the District of Columbia by members of the 24 Jurisdiction End-User
Purchasers;

19

d.    Fla. Stat. § § 501.201, et seq., (the Florida Unfair and Deceptive Trade
      Practices Act), with respect to purchases of TriCor® in Florida by
      members of the 24 Jurisdiction End-User Purchasers;

e.    Iowa Competition Law  § § 553.4, 553.5  with respect to purchases of
      TriCor® in Iowa by members of the 24 Jurisdiction End-User Purchasers;

f.    Kan. Stat. Ann. §§ 50-801(b) and 50-101, et seq., with respect to
      purchases of TriCor® in Kansas by members of the 24 Jurisdiction
      End-User Purchasers;

g.    Louisiana Revised Statutes § 51:137 with respect to purchases of TriCor®
      in Louisiana by members of the 24 Jurisdiction End-User Purchasers;

h.    Maine Revised Statutes Annotated 10 M.S.R.A § 1101, et seq., and/or
      Maine's Unfair Trade Practices Act, 5 M.S.R.A. § 205-A, et. seq. with
      respect to purchases of TriCor® in Maine by members of the 24
      Jurisdiction End-User Purchasers;

i.    Massachusetts Consumer Protection Act, Mass. Gen. Laws, ch. 93A, et
      seq. with respect to purchases of TriCor® in Massachusetts by members of
      the 24 Jurisdiction End-User Purchasers;

j.    Michigan Antitrust Reform Act, MCL § 445.771, et seq., and/or the
      Michigan Consumer Protection Act, MCL § 445.901, et. seq., with respect
      to purchases of TriCor® in Michigan by members of the 24 Jurisdiction
      End-User Purchasers;

k.    Minnesota Antitrust Act of 1961, Minn. Stat §§ 325D.49, et seq., with
      respect to purchases of TriCor® in Minnesota by members of the 24
      Jurisdiction End-User Purchasers;

l.    Mississippi Code Ann. §§ 75-21-1, et seq. with respect to purchases of
      TriCor® in Mississippi by members of the 24 Jurisdiction End-User
      Purchasers;

m.    Nebraska. Rev. Stat §§ 59-801, et seq. with respect to purchases of
      TriCor® in Nebreska by members of the 24 Jurisdiction End-User
      Purchasers;

n.    Nevada Unfair Trade Practice Act, NRS 598A, et. seq., with respect to
      purchases of TriCor® in Nevada by members of the 24 Jurisdiction
      End-User Purchasers;

o.    New Jersey Consumer Fraud Act, N.J. Stat. Ann. § § 56:8-1, et seq., with

20

respect to purchases of TriCor® in New Jersey by members of the 24 Jurisdiction End-User Purchasers;

p.    New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases of TriCor® in New Mexico by members of the 24 Jurisdiction End-User Purchasers;

q.    The Donnelly Act, N.Y. General Business Law § 340 et seq., with respect to purchases of TriCor® in New York by members of the 24 Jurisdiction End-User Purchasers;

r.    North Carolina Gen. Stat. §§ 75-1, et seq., with respect to purchases of TriCor® in North Carolina by members of the 24 Jurisdiction End-User Purchasers;

s,    North Dakota Cent. Code §§ 51-08.1-01, et seq., with respect to purchases of TriCor® in North Dakota by members of the 24 Jurisdiction End-User Purchasers;

t.    South Dakota Antitrust Law, SDCL ch. 37-1, et seq., with respect to purchases of TriCor® in South Dakota by members of the 24 Jurisdiction End-User Purchasers;

u.    Tennessee Code Ann. §§ 47-25-101, et seq., and/or Tennessee Code Ann. §§ 47-18-101, et. seq., with respect to purchases of TriCor® in Tennessee by members of the 24 Jurisdiction End-User Purchasers;

v.    Vermont Antitrust Law, Vermont Stat. §§ 2453, et. seq. with respect to purchases of TriCor® in Vermont by members of the 24 Jurisdiction End-User Purchasers;

w.    West Virginia Consumer Credit and Protection Act, W. Va. Code §§ 46A-1-101, et seq., with respect to purchases of TriCor® in West Virginia by members of the 24 Jurisdiction End-User Purchasers; and

x.    Wisconsin Antitrust Act, §§ 133.01 et. seq, Wis. Stats., with respect to purchases of TriCor® in Wisconsin by members of the 24 Jurisdiction End-User Purchasers.

88.    Plaintiffs and the 24 Jurisdiction End-User Purchasers seek damages and multiple damages as permitted by law for their injuries caused by Defendants' violations of the aforementioned statutes.

21

## COUNT III

## FOR RESTITUTION, DISGORGEMENT AND CONSTRUCTIVE TRUST FOR UNJUST ENRICHMENT BY DEFENDANT

89.    Plaintiffs repeat and incorporate herein by reference paragraphs 1 through 88 of this Complaint as if fully set forth herein.

90.    This Count is brought by plaintiffs on behalf of the Class.

91.    Defendants have benefitted from the monopoly profits on their sale of TriCor® resulting from their unlawful and inequitable acts alleged in this Complaint.

92.    Defendants' financial benefits resulting from their unlawful and inequitable conduct are traceable to overpayments for TriCor® by plaintiffs and the Class.

93.    Plaintiffs and the Class have conferred an economic benefit upon Defendants in the nature of profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of plaintiffs and the Class.

94.    The economic benefit of overcharges and monopoly profits derived from Defendants by charging supra-competitive and artificially high prices for TriCor® is a direct and proximate cause of Defendants' unlawful conduct.

95.    The financial benefits derived by Defendants rightfully belong the plaintiff and the Class, as plaintiff and the Class paid anti-competitive and monopolistic prices during the Class Period inuring to the benefit of Defendants.

96.    It would be inequitable for Defendants to be permitted to retain any of the unlawful proceeds resulting from Defendants' fraudulent conduct and the filing of sham patent litigation.

97.    It would be inequitable for Defendants to be permitted to retain any of the

overpayments for TriCor® made by plaintiff and the Class which were derived from Defendants' unlawful and anti-competitive methods, acts and trade practices, as alleged in this Complaint.

98.    Defendants should be compelled to disgorge into a common fund for the benefit of plaintiff and the Class all unlawful or inequitable proceeds they have received.

99.    A constructive trust should be imposed upon all unlawful or inequitable monies received by Defendants traceable to plaintiffs and the Class.

100.    Plaintiffs and the Class have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class they seek to represent pray for judgment against Defendants for the following relief:

A.    For an order certifying the Class pursuant to Federal Rule of Civil Procedure 23, certifying plaintiffs as the representatives of the Class and designating their counsel as counsel for the Class;

B.    for an order that Defendants' actions violate § 2 of the Sherman Act;

C.    for an order that Defendants' actions constitute a violation of the antitrust and/or deceptive trade practice statutes in the 24 Jurisdiction End-User Purchasers;

D.    for an Injunction enjoining and restraining Defendants' continued violation of §2 of the Sherman Act, pursuant to §16 of the Clayton Act;

E.    for an order granting plaintiffs and the Class equitable relief in the nature of disgorgement, restitution and the creation of a constructive trust to remedy Defendants' unjust enrichment;

F.    for an order requiring Defendants to pay monetary damages to plaintiff and the Class as permitted by law;

23

G.    for an order granting plaintiffs and the Class' the costs of prosecuting this action,

together with the interest and reasonable attorneys' fees, experts' fees and costs;

and

H.    for an order granting such further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury of all claims so triable asserted in this Complaint.

Date: July 8, 2005

Respectfully,

SILVERMAN, MCDONALD & FRIEDMAN

By:    _____
Michael I. Silverman
DE Bar ID: 3034
1010 North Bancroft Parkway, Suite 22
Wilmington, DE 19805
(302) 888-2900

OF COUNSEL:
Lester L. Levy
Wolf Popper LLP
845 Third Avenue
New York, NY 10022
(212) 759-4600

Ann D. White
Jayne A. Goldstein
Lee Albert
Mager White & Goldstein, LLP
One Pitcairn Place, Suite 2400
165 Township Line Road
Jenkintown, PA 19046
(215) 481-0273

24

165 Township Line Road
Jenkintown, PA  19046
(215)  481-0273